# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

CONESE HALLIBURTON, §
§
　*Plaintiff,* §
§　　Case No.: _____
*v.* §
§　　JURY DEMANDED
MICHAEL JOHN REYNOLDS, §
§
　*Defendant.* §

## COMPLAINT

## INTRODUCTION

1.　　While visiting Nashville for a bachelor party, Defendant Michael John Reynolds—then an officer of the New York City Police Department—kicked in the front door of Ms. Halliburton's home during the middle of the night. After breaking into Ms. Halliburton's home, Officer Reynolds threatened "to break every fucking bone in [Ms. Halliburton's] fucking neck" while screaming that she and her children were "fucking niggers."

2.　　Approximately eight minutes after invading Ms. Halliburton's home, terrorizing Ms. Halliburton and her minor children, hurling racial slurs at them, and threatening them with deadly force, Officer Reynolds casually returned to the Airbnb where he was staying when it became clear to him that police were about to arrive. Upon leaving Ms. Halliburton's home, a companion of Officer Reynolds yelled out and asked him: "Did you make her strip?"

3.　　After leaving Ms. Halliburton's property, Officer Reynolds was confronted

by uniformed police officers of the Metropolitan Nashville Police Department who had responded to Ms. Halliburton's 9-1-1 call. After being confronted by those MNPD officers, Officer Reynolds immediately "identified [himself] as a police officer" in order to avoid arrest.

4. Despite claiming that he did not know why he was not arrested on the spot for his outrageous criminal misconduct, Officer Reynolds acknowledged the existence of "an unwritten rule of professional courtesy that police officers tend to try and help out other police officers." By invoking his authority as a fellow police officer, Officer Reynolds sought to—and was able to—benefit from that "unwritten rule of professional courtesy" and avoid arrest.

5. The following day, Ms. Halliburton recognized Officer Reynolds from a neighbor's surveillance footage as being the person who had invaded her home and assaulted her and her children while screaming racial slurs at them.

6. After noticing Ms. Halliburton's neighbor staring at Officer Reynolds and his companions, NYPD Officer Thomas Geberth—whose bachelor party had brought Officer Reynolds and his companions to Nashville—began menacing Ms. Halliburton's neighbor and demanded to know: "[W]hat are you looking at?" When Ms. Halliburton's neighbor responded that "I think I'm looking at the people that broke into my neighbor's house last night," Officer Geberth less-than-subtly began threatening Ms. Halliburton and her neighbors in an effort to intimidate them.

7. Among other statements that were specifically intended to be perceived as threatening, Officer Geberth emphasized that "we're policemen from New York," and he indicated that everyone needed to understand that Officer Reynolds's home invasion was "not really a big issue" that should be pursued any further. Thereafter, Officer Reynolds,

-2-

Officer Geberth, and the other bachelor party attendees laughed about Officer Reynolds's home invasion; they claimed that because they were NYPD officers, they had immunity; and they went to dinner.

8. Several weeks after fleeing the jurisdiction and attempting to avoid accountability for his egregious and criminal misconduct, Officer Reynolds was identified as the person who was responsible for breaking into Ms. Halliburton's home and assaulting her and her children. Officer Reynolds was ultimately indicted for his crimes against Ms. Halliburton and her children within one year of causing the injuries at issue in this action; he pleaded guilty to aggravated criminal trespass and three separate counts of assault; and he was sentenced to fifteen (15) days in jail and nearly three (3) years of probation for his crimes.

9. Thereafter, Officer Reynolds resigned from the New York City Police Department in lieu of facing professional disciplinary proceedings. This action followed.

## I. PARTIES

10. Plaintiff Conese Halliburton is a citizen and resident of Davidson County, Tennessee. She is a mother of four and resides at 1206 Ashwood Avenue, Nashville, Tennessee, 37212—the residence that Officer Reynolds invaded before threatening to kill Ms. Halliburton and her children while screaming that they were "fucking niggers."

11. Defendant Michael John Reynolds is the individual who invaded Ms. Halliburton's home and threatened "to break every fucking bone in [Ms. Halliburton's] fucking neck" while screaming that she and her children were "fucking niggers."

12. At all times relevant to this Complaint, Officer Reynolds was a police officer employed by the New York City Police Department. Reynolds is a citizen of Rockland County, New York, who is domiciled at 33 Frederick Street, Garnerville, NY 10923, but he

may be served while he is physically present within this Court's jurisdiction at the Davidson County Jail, Maximum Correctional Center (MCC), his current place of residence.

## II. JURISDICTION & VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1331.

14. As the jurisdiction in which a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred and where the property that is the subject of this action is situated, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## III. FACTUAL ALLEGATIONS

15. Conese Halliburton has lived at 1206 Ashwood Avenue for her entire life—more than 40 years.

16. While visiting Nashville for NYPD Officer Thomas Geberth's bachelor party—which Officer Reynolds was in charge of planning—Officer Reynolds and several other men arrived at 1212 Ashwood Avenue, an adjacent short-term rental property that Officer Reynolds had booked via Airbnb.com.

17. Officer Geberth's bachelor party was scheduled to take place from a Sunday through a Wednesday. At approximately 2:30 a.m. on Monday morning—and after an evening of heavy drinking on Broadway—Officer Reynolds strode past the "no trespassing" signs posted on Ms. Halliburton's property and began yelling in the middle of her yard. Ms. Halliburton immediately called 9-1-1.

18. After yelling in the middle of her yard, Officer Reynolds began banging on Ms. Halliburton's locked front door before kicking it in and gaining entry to her home,

-4-

where Ms. Halliburton and her children had been sleeping.

19. After gaining entry to Ms. Halliburton's home, Officer Reynolds stomped into her living room and made it past her first bedroom. Ms. Halliburton and her children began yelling at Officer Reynolds and pleading with him to leave. He would not.

20. In order to prevent Officer Reynolds from coming down the hall toward her any further, two of Ms. Halliburton's children got between their mother and Officer Reynolds and pushed against him while Ms. Halliburton's youngest child clung to his mother in fear. Still, Officer Reynolds refused to leave their home.

21. During the altercation, Officer Reynolds screamed expletives at Ms. Halliburton and her family, yelled that "this is my motherfucking house," threatened to shoot them and "break every fucking bone in [Ms. Halliburton's] fucking neck," and called Ms. Halliburton and her sons "fucking niggers." Officer Reynolds's home invasion lasted approximately eight minutes.

22. When Ms. Halliburton informed Officer Reynolds that police were around the corner, Officer Reynolds finally left Ms. Halliburton's home and headed directly back to his Airbnb. After leaving Ms. Halliburton's home, one of Officer Reynolds's companions yelled out to him and asked: "Did you make her strip?"

23. When police finally arrived at the scene, Ms. Halliburton had a panic attack and began vomiting. She has suffered from extreme emotional injury ever since.

24. After Officer Reynolds left Ms. Halliburton's home, he was confronted by uniformed MNPD Officers. Mr. Reynolds immediately "identified [himself] as a police officer" and, as a result, he avoided arrest. *See* **Exhibit #1**, Sentencing Hearing Transcript in Case No. 2019-I-384, p. 68, lines 9–15.

25. The morning after Officer Reynolds invaded Ms. Halliburton's home and

assaulted her and her children, Ms. Halliburton spoke with two of her neighbors, Joetta Alderson and Justin Roddick, and told them what had happened. Thereafter, Mr. Roddick retrieved and reviewed surveillance footage of the incident from his security camera.

26. When Officer Reynolds and several other men emerged from a van later that afternoon, Ms. Halliburton recognized him and, along with her neighbors, confronted the group.

27. After being confronted by Mr. Roddick, Officer Geberth began menacing Ms. Halliburton and her neighbors and making statements that were specifically designed to intimidate them into dropping the matter and not reporting it further.

28. Because Ms. Halliburton, who was still shaken from Officer Reynolds's home invasion, was unable to speak, Mr. Roddick began speaking on her behalf.

29. Officer Reynolds ultimately acknowledged that he was the person who had broken into Ms. Halliburton's home. With a smile on his face, and while giggling, he then "apologized" for doing so. Officer Reynolds's entire group then began laughing at Ms. Halliburton as she was visibly upset.

30. Finally able to speak, Ms. Halliburton—still distraught and shaken— indicated that she wanted Officer Reynolds arrested and called the police again.

31. Thereafter, Officer Geberth made clear to Ms. Halliburton and her neighbors that his group was made up of NYPD officers, and he claimed that as police officers, they had immunity. Officer Geberth, Officer Reynolds, and the rest of their party all specifically claimed that they had immunity as well. *See* **Exhibit #1**, p. 26, lines 8– 13.

32. Rather than waiting for police to arrive, Officer Reynolds and his

companions left the scene and went out to dinner before another night of drinking on Monday evening.  By the time MNPD officers arrived, Officer Reynolds and his friends were gone.

33.     Seeking to avoid prosecution, Officer Reynolds never returned to the Airbnb, and he fled the jurisdiction entirely on Tuesday—a day earlier than planned.

34.     Despite knowing that he had committed serious crimes against Ms. Halliburton, Officer Reynolds did not turn himself in to law enforcement or come clean about what he had done.

35.     Instead, Officer Reynolds took substantial efforts to avoid being prosecuted.

36.     From the moment of his home invasion until his ultimate arrest, Officer Reynolds's companions, including multiple NYPD officers, attempted to assist him in avoiding prosecution by, *inter alia*, falsely reporting that they had no knowledge about what had happened and attempting to intimidate Ms. Halliburton and her neighbors from pursuing the matter.

37.     Weeks after Officer Reynolds invaded Ms. Halliburton's home and threatened to kill her and her children for being "fucking niggers," MNPD detectives identified Officer Reynolds as the assailant, and they left him several voicemails regarding the incident, which he did not return.

38.     It was only after Officer Reynolds realized that he had been identified by law enforcement officials who were intent on pursuing the matter that Officer Reynolds began undertaking efforts to appear as though he accepted responsibility for his misconduct. Specifically, after receiving voicemails from MNPD detectives, Officer Reynolds retained counsel, notified his union, set up a meeting with the MNPD, and gave what his counsel would later describe as "a full confession" to the crimes that he had committed—crimes

-7-

that could already be proven beyond any conceivable doubt and were recorded on surveillance footage. Officer Reynolds would ultimately plead guilty only to specific charges that he believed would allow him to keep his job as an NYPD Officer.

39. Criminal charges were ultimately brought against Officer Reynolds regarding the injuries that he inflicted upon Ms. Halliburton and her family and his trespass upon her property.

40. The conduct that gave rise to Ms. Halliburton's injuries and causes of action for civil damages set forth in this Complaint were the subject of a criminal prosecution commenced by law enforcement, the Davidson County District Attorney General, and the Davidson County Grand Jury within one year.

41. After being indicted by the Davidson County Grand Jury, Officer Reynolds pleaded no contest to one count of aggravated criminal trespass and three counts of assault. *See* **Exhibit #2**, Transcript of Plea Hearing, Case No. 2018-C-2069.

42. During Officer Reynolds's sentencing hearing, and while subject to Officer Reynolds's cross-examination, Ms. Halliburton testified as follows regarding what happened on the night of the incident:

> [W]hile I was on the phone with [9-1-1-], you know how it sounds like knock -- when somebody is like knocking at your door. . . . It was like vibrations, like really loud. It was like boom, boom, boom, and I'm telling the lady. I was like it sounds like he's trying to come in my house because it wasn't a knock. It was a boom, and it continued to the point that the last one, you heard the dogs run.
>
> . . .
>
> Mr. Reynolds. He was like in the house, not like in the living room. He was... He made it past that first bedroom.
>
> . . .
>
> He was like – he's like this is my mother fucking house. This is my mother

-8-

fucking house.  And so, I'm on the phone with the 9-1-1 operator and I'm telling her, I was like he's in my house, like hurry up and, you know, get to my kids because he just kept coming like down the hallway.  And even though -- even though the dogs -- I had two dogs that was absolutely trying to like bite at him, at his shorts, he was still like fighting them off and he still was coming like down the hallway.

. . .

[E]ven with my sons, he's like standing there.  And they're like trying to push him back, and he's still like -- he still kept coming down the hall.  Nothing was like stopping him.

. . .

They had their bodies up against him.  They were like close.  They was like -- they was like this close, and I was telling -- and the operator was telling me like tell your sons like don't fight him, just like the police is coming, the police coming.  And so, they was like all just arguing.  And the... They was just arguing like in the hallway trying to tell him like get out, get out.  Like, he was in the house for like seven, eight minutes the whole entire time.  So, it was like dogs barking.  They're arguing and he's not backing down at all.

. . .

He just kept repeating that this was his house.

. . .

I think, once he heard me say and I was telling my sons like the police is like coming, like they're coming.  And the lady was telling me, she's like they're like around the corner, they're like coming down the street.

. . .

And as he – he's walking.  Like, I'm coming down the hall and he's walking.  Like, he walked -- he didn't run out the door.  He leisurely just walked out the door.  He's saying something about I'm going to shoot y'all niggers, something like that, as he walks out the door.  And then, Metro comes probably not even a minute later.

. . .

I had a panic attack and I started getting sick, and I went and I started throwing up[.]

**Exhibit #1**, p. 41, line 3–p. 47, line 12.

-9-

43. During Officer Reynolds's sentencing hearing, and while subject to Officer Reynolds's cross-examination, Ms. Halliburton testified as follows about what happened on the day after the incident:

> When I seen him, I was like -- I was pointing as they was like coming out of the house, and I was like no, that's not you. I was like no, it's you right there, and I was like you. And Justin is saying which one of y'all kicked in my neighbor's door. So, they were all like oh, you know, we don't know what you're talking about like very nonchalant and joking like it was funny and it was a joke. And I was like you know what you did. And I'm saying, when the police came and questioned, why didn't you say anything, why didn't you say it. So, then he says oh, I'm sorry, I was drunk. And I was like no, you're not sorry, you should have said it was you, you should have said something. And he's like I'm sorry. And I was like I want you arrested. I said, as a matter of fact, I'm going to go call the police right now. And I walked off and called Metro again.
>
> . . .
>
> [Officer Geberth] was talking a lot of mess and it was a joke like it was funny. And even when we were waiting -- we had to wait for Metro to come. We waited for like an hour or so. When Metro arrived, while I was talking to the officer, they left the scene. And a couple of them came back, but he didn't come back with them. It was a joke then because one of them waved at me while I was sitting outside talking to the cop like it was still funny. And when Metro went and questioned them, they acted like I was crazy and they didn't know anything that we were talking about, they didn't know him, they didn't know the -- nothing about the incident even happened.

*Id.* at p. 49, line 19–p. 51, line 2.

44. During Officer Reynolds's sentencing hearing, and while subject to Officer Reynolds's cross-examination, Ms. Halliburton testified as follows about how the incident had affected her and her family:

> Personally, before, I struggled with a lot of stuff. And it took me to this Summer to actually watch that video, and it was like hard to watch the video and to know that he had more than one opportunity to go to that Airbnb. He didn't have to come to my house. And to know that there was another person outside... To know that he had a friend that was sitting outside and, on the video, you could hear his friend say don't go, and then to hear his friend say did you make her strip. It was no accident that you came into my house. So, for a person that's already struggled with a lot of stuff, to hear something like that on that video, that set me back a lot, and then to hear

my kids. One of them, he doesn't even like to go outside when it's dark or to be in -- to be comfortable in your own home, to always have the lights on, to drive down the street and you see a Metro car. You don't know if you're going to get harassed or -- or to always get questioned. I don't talk about it. I let my kids talk about it because they can get it out, but to get questioned on why are you not in jail, why did he have to do it to us. I don't understand why is this going on. It's hard.

. . .

We're all in counseling. Except for the oldest. I think everybody pretty much walks around on edge.

. . .

My kids want to move. They don't want to be in that house anymore. We don't have peace. To know that you've been living somewhere all your life, and you don't have that anymore, and where would you go, it's not fair. And it's not fair that somebody can laugh in your face and their friends can laugh about it like it's a joke, and your life stops, and their life can keep on going. And they're supposed to keep a job, and you're supposed to uphold the law. And you break the law in another state and you feel like you're supposed to get away with it. There's nothing about that right. And to hear them brag about they got immunity, and for this to go on this long, it was so many -- he had so many different opportunities to walk away from that decision that he made, and he still didn't do it. That is not right. It's not fair. My kids don't have that choice. My boys wouldn't have a choice to sit and break into anybody's house, and get away with it, and not serve any time and get probation, and get a slap on the wrist, get immunity because why, they're a police officer. He should be treated just like anybody else would.

. . .

If I could afford a new mind and give my kids a new mind, there's no price on that. You can't put a price tag on peace. You can't give back what was taken away from us that night. I wish it wouldn't have ever happened.

*Id.* at p. 54, line 1–p. 56, line 12.

45. During Officer Reynolds's sentencing hearing, Officer Reynolds testified without qualification that he did not dispute Ms. Halliburton's testimony. Instead, he indicated that he had heard all of Ms. Halliburton's testimony and testified as follows:

**Q. Do you have any doubt that what she said was true?**

**A. No, sir.**

*Id.* at p. 67, lines 1–3 (emphasis added).

46. Officer Reynolds's conduct caused Ms. Halliburton to suffer severe emotional distress from which she is still suffering.

47. Ms. Halliburton and her two youngest children underwent—and are still undergoing—counseling due to Officer Reynolds's conduct.

48. Officer Reynolds's conduct resulted in damage to Ms. Halliburton's personal property.

49. As of the date of his sentencing hearing, Officer Reynolds's footprint was still visible on Ms. Halliburton's broken front door.

50. During Officer Reynolds's sentencing hearing, Officer Reynolds "admit[ted] freely that [he] committed a crime that night"—indeed, he admitted that he committed "[m]ultiple crimes"—and he further admitted that he "pled to those crimes[.]" *Id.* at p. 67, lines 16–21.

51. During Officer Reynolds's sentencing hearing, Officer Reynolds expressed substantial remorse for the fact that his conduct had "cost me ***my*** job, ***my*** life, everything." *Id.* at p. 66, lines 14–15 (emphases added).

52. During his sentencing hearing, Officer Reynolds had to be reminded by his counsel that he was also supposed to express remorse for his actual misconduct and its devastating effect on Ms. Halliburton and her family, rather than expressing remorse exclusively for the consequences that his actions had had on him personally. *Id.* at lines 16–20. Unconvincingly, at his counsel's urging, he did so.

53. In an attempt to influence the outcome of his sentencing hearing, Officer Reynolds gave false and utterly incredible testimony regarding multiple material facts about the incident and its aftermath, including why he had invaded Ms. Halliburton's home, what he told police officers the night he invaded Ms. Halliburton's home and why,

-12-

what he could recall Officer Geberth saying to Ms. Halliburton's neighbors the following day, whether he or his companions had ever claimed immunity, and whether he had fled the jurisdiction in an attempt to avoid prosecution. Thereafter, upon review of Officer Reynolds's testimony, the Court ruled from the bench as follows:

> **[T]he Court, quite frankly, I just -- I can't accept the testimony of Mr. Reynolds at face value.** I just -- I mean, as I said, he comes down to that house with his -- one of his friends yelling at him to come back, don't go down there, hey, we're over here and he responds to him. I mean, he hears him. He responds to him. I couldn't pick up exactly what he says, but he continues on the path to the Halliburton's house. As I said, after he left, he had no problem returning to that house and going into the bedroom where I think he was hoping he could go to sleep without being discovered. And **when the police do arrive, he has enough wherewithal to make sure that they know he is a police officer, and I think he did that for one reason. And I find the reason he did that was in the hopes of getting the professional courtesy that police officers frequently give to each other and that this thing would blow over.**

> Then again, **I can't accept what he said in terms of the events that occurred that next evening before they went to dinner.** Not only did Ms. Halliburton describe the demeanor of this group. Mr. Roddick, who doesn't even have a dog in this hunt, has nothing to gain or lose by it, he comes up here and he clearly testifies to the exact same thing that Ms. Halliburton testified to, and he testified to it before. I mean, and again, the Court believes that -- I think these gentlemen thought that, because they were police officers, they would be able to get away with it.

> Mr. Reynolds tries to put a positive perspective on this case to say listen, I flew down at my own expense and voluntarily gave a statement as to what occurred on this particular occasion. He did that after he gets a voicemail left from the Metropolitan Police Department. Up until that point in time, I suspect he was having a ten-day, twenty-day, however many days it was before the phone call came in, sigh of relief that life was back to normal in New York, and I can go on, and this is all behind me and nothing is going to happen. And then oops, there's a voicemail left by a detective who had the wherewithal to investigate this matter much further to try and get to the bottom of what was going on and with the grace of Mr. Roddick having video kind of assisted in establishing the events that occurred on that evening. According to the presentence report, before he came down here, I.A. was also involved, so internal affairs. So, while he comes down here voluntarily, I don't think he was in a position to do otherwise. He knew that the gig was up. Metro knew exactly who his was. They were able to identify him, and they weren't going to just drop the ball and say don't come back to Nashville.

And then, quite frankly, **in his mea culpas today, every one of those mea culpas started out with the fact that I regret this because of what it has done to my life.** The only time -- or the first time that it came up, and the impact that it had on the Halliburtons, was when Mr. Yarbrough so eloquently directed him to that particular aspect of that situation, that oh, yeah, there was somebody else that, you know, was in – was involved in this, that maybe I ought to say I'm sorry for what it caused to them as well. So, **I kind of question just how sincere his apology was, just how regretful he was.** I think, had he really felt that from the beginning, he would have dealt with it while he was here in Nashville. They would have come clean. They would have told the police what was going on. **He found out the next day that his friends lied to the police. They did nothing to correct those very lies, and they're police officers.** I mean, they, of all people, I'm sure, get frustrated constantly by citizens who lie to them when they're trying to do investigations. And yet, they are perpetrating that absolute lie and fraud on the Metro Police Department. And again, but for a couple of detectives who stayed on top of it, they would have gotten away with it.

As far as the racial slur, obviously everyone in this courtroom absolutely knows how abhorrent that is, and repugnant, and cannot, under any circumstances, be -- well, I can't even get the word out, mitigated. Let me use that word. And I just don't know what I – I will -- I don't have any reason to believe he has any kind of racial animosity in him. It just seems awful unusual that, out of the blue, something that is not a part of you becomes a part of you on a particular night, but there's no question that the seriousness of that vile type of conduct.

*Id.* at p. 109, line 8–p. 112, line 18 (emphases added).

54. After Officer Reynolds's sentencing hearing, the Court determined that Officer Reynolds's conduct had profoundly impacted the Halliburtons and would continue to impact the Halliburtons, finding that:

Not only were they terrorized for that seven or eight minutes, which probably seemed like seven or eight hours, they've continued to suffer repercussions of it to this very day. I mean, you can tell, just in the way Ms. Halliburton was testifying, that it's still fresh on her mind and she's still coping with the consequences of what occurred.

I also noticed that, when Mr. Reynolds got up here to testify, and I don't know if it was a son, but one of the individuals that I assumed was her son, when he got up, he just shook his head and walked out of the room like, you know, I just can't deal with this. So, the Court is fully satisfied that the

-14-

consequences of the seven or eight minutes go well beyond that night and continue to this very day to the extent that a person who has lived in her -- this same house all of her life, and therefore her children in that same house all their life, none of them want to live there any longer. They can't find any peace, and comfort, and safety in their own home, which is supposed to be the one place we all are able to go to and have those things and total peace of mind. And that has been clearly and unequivocally stolen from the Halliburtons, all of them.

*See id.* at p. 108, line 9–p. 109, line 7.

57. In sum, the Court correctly determined that "the lives of four people have been forever shattered." *Id.* at p. 112, lines 22–23.

56. This action, arising out of the same events, seeks to make Ms. Halliburton whole.

## IV. CAUSES OF ACTION

### COUNT 1: TRESPASS

57. Ms. Halliburton incorporates and realleges the foregoing allegations as if fully set forth herein.

58. Officer Reynolds trespassed upon Ms. Halliburton's property and forcefully entered her home during the middle of the night.

59. Officer Reynolds did not have consent to enter Ms. Halliburton's home.

60. By trespassing upon Ms. Halliburton's property and entering her home without her consent during the middle of the night, Officer Reynolds far exceeded the scope of implied license enjoyed by the general public.

61. Officer Reynolds entered Ms. Halliburton's home without her consent and without any legal right to do so.

62. Officer Reynolds pleaded guilty to aggravated criminal trespass with respect to his unlawful entry into Ms. Halliburton's home.

-15-

63. Officer Reynolds was, in fact, guilty of aggravated criminal trespass with respect to his unlawful entry into Ms. Halliburton's home.

64. Through the foregoing actions, Officer Reynolds trespassed upon Ms. Halliburton's property.

65. Ms. Halliburton suffered damages as a consequence of Officer Reynolds's trespass, and she is entitled to recover for all injuries sustained as a natural and proximate result of the Defendant's wrong.

### COUNT 2: TRESPASS TO CHATTELS/CONVERSION

66. Ms. Halliburton incorporates and realleges the foregoing allegations as if fully set forth herein.

67. During the course of his home invasion, Officer Reynolds kicked in Ms. Halliburton's front door, splitting her door's frame and breaking it.

68. By kicking in Ms. Halliburton's front door, Officer Reynolds intentionally used or intermeddled with Ms. Halliburton's rightful possession of her personal property.

69. By kicking in Ms. Halliburton's front door, Officer Reynolds appropriated Ms. Halliburton's door to his own use and benefit, exercising dominion over it, in defiance of Ms. Halliburton's rightful exclusive ownership of her personal property.

70. Officer Reynolds did not have Ms. Halliburton's permission or authorization to kick in Ms. Halliburton's front door.

71. Through the foregoing actions, Officer Reynolds is liable for trespass to her chattels and/or conversion of Ms. Halliburton's personal property.

72. Ms. Halliburton suffered damages as a consequence of Officer Reynolds's trespass to chattels and conversion, and she is entitled to recover for all injuries sustained

-16-

as a natural and proximate result of the Defendant's wrong.

## COUNT 3: ASSAULT

73.     Ms. Halliburton incorporates and realleges the foregoing allegations as if fully set forth herein.

74.     After kicking in Ms. Halliburton's front door, Officer Reynolds entered Ms. Halliburton's home and advanced toward her in a threatening manner.

75.     Officer Reynolds attempted—or gave the unmistakable appearance of an intentional attempt—to do harm to, or to frighten, Ms. Halliburton.

76.     Officer Reynolds threatened Ms. Halliburton with deadly force and threatened to break her neck.

77.     Officer Reynolds assaulted Ms. Halliburton.

78.     Officer Reynolds has unqualifiedly admitted that he assaulted Ms. Halliburton.

79.     Officer Reynolds pleaded guilty to assaulting Ms. Halliburton.

80.     Through the foregoing actions, Officer Reynolds is liable to Ms. Halliburton for assault.

81.     Ms. Halliburton suffered damages as a consequence of Officer Reynolds's assault, and she is entitled to recover for all injuries sustained as a natural and proximate result of the Defendant's wrong.

## COUNT 4: VIOLATION OF 42 U.S.C. § 1983

82.     Ms. Halliburton incorporates and realleges the foregoing allegations as if fully set forth herein.

83.     At all times relevant to this Complaint, Officer Reynolds acted pursuant to

-17-

his purported authority under color of law as an Officer of the New York City Police Department, which authority he repeatedly and affirmatively asserted.

84. At all times relevant to this Complaint, Officer Reynolds purported to exercise his official authority as a New York police officer.

85. At all times relevant to this Complaint, Officer Reynolds invoked his official authority as a New York police officer as a justification for his conduct.

86. At all times relevant to this Complaint, Officer Reynolds acted pursuant to an expressly asserted claim of official immunity due to his status as a New York police officer.

87. As an explanation for his tortious conduct, Officer Reynolds specifically, affirmatively, and immediately invoked his status as a New York police officer and informed law enforcement that he was a New York police officer in order to avoid arrest.

88. Officer Reynolds specifically claimed that he had immunity for any and all actions that he directed toward Ms. Halliburton and her children because he was a New York police officer.

89. Officer Reynolds called upon and utilized the assistance of other NYPD Officers in an effort to avoid prosecution and accountability for his criminal misconduct.

90. The Davidson County Criminal Court, in a final and unappealed sentencing order, specifically found that Officer Reynolds and his fellow NYPD Officers "thought that, because they were police officers, they would be able to get away with it." *Id.* at p. 110, lines 8–10.

91. Officer Reynolds broke into Ms. Halliburton's home, assaulted Ms. Halliburton and her children, threatened Ms. Halliburton with deadly force, and then attempted to intimidate Ms. Halliburton from reporting his misconduct to law

-18-

enforcement pursuant to his affirmative claim of authority as a New York police officer and because he believed and contended that, as a New York police officer, he was actually or constructively immune from prosecution, liability, or accountability of any kind.

92. Officer Reynolds took affirmative steps to intimidate Ms. Halliburton from reporting him to law enforcement and to compel her silence by declaring—and expressly invoking—his status as a New York police officer.

93. Officer Reynolds attempted to coerce Ms. Halliburton into abandoning her legitimate criminal complaint about his criminal misconduct based on his claimed immunity as a New York police officer.

94. At all times relevant to this Complaint, Officer Reynolds acted under pretense of official authority under color of law and attempted to use his status as a New York police officer advantageously and for illegal and unlawfully coercive purposes.

95. At all times relevant to this Complaint, Officer Reynolds acted under color of law by invoking and abusing the position given to him by the State of New York and the New York City Police Department.

96. At all times relevant to this Complaint, Officer Reynolds's claim of official authority due to his status as a New York police officer pervaded, and was inextricably intertwined with, his conduct toward Ms. Halliburton and her children.

97. At all times relevant to this Complaint, Ms. Halliburton had a clearly established right not to be gratuitously assaulted for absolutely no reason.

98. At all times relevant to this Complaint, Ms. Halliburton had a clearly established right not to have her home unlawfully invaded for absolutely no reason.

99. At all times relevant to this Complaint, Ms. Halliburton had a clearly established right not to be subjected to unlawful coercion based on police authority.

-19-

100. At all times relevant to this Complaint, Ms. Halliburton had a clearly established right not to be threatened with deadly force for exercising her constitutionally protected right to report criminal activity.

101. At all times relevant to this Complaint, Ms. Halliburton had a clearly established right not to be threatened for exercising her constitutionally protected right to call the police and file a legitimate criminal complaint.

102. At all times relevant to this Complaint, Officer Reynolds, acting under color of law as a New York police officer, abused his authority in a naked attempt to interfere with—and to chill Ms. Halliburton from exercising—her First Amendment right to report his crimes against her to law enforcement.

103. New York's personal injury statute of limitations applies to Ms. Halliburton's 42 U.S.C. § 1983 claims regarding the unlawful actions that Officer Reynolds undertook in his capacity as a New York police officer, which Ms. Halliburton states against Officer Reynolds in his individual capacity only.

### COUNT 5: NEGLIGENCE

104. At all times relevant to this Complaint, Officer Reynolds had a duty of care to conduct himself as a reasonably prudent person would.

105. Officer Reynolds asserted under oath that he "made a mistake" because he "consumed too much alcohol." **Exhibit #1**, p. 67, lines 6–7.

106. In the alternative to the above-pleaded intentional misconduct, although acting only unintentionally, Officer Reynolds acted negligently and/or recklessly and failed to exercise ordinary or reasonable care under the circumstances.

107. Through his negligent and/or reckless conduct, Officer Reynolds breached

his duty of care to Ms. Halliburton, proximately causing her to suffer injury and loss.

108. Officer Reynolds is liable to Ms. Halliburton for all damages suffered as a consequence of his negligent acts and omissions.

### COUNT 6: NEGLIGENCE *PER SE*

109. Tennessee Code Annotated §§ 39-14-408, 39-14-405(a), 39-13-101(a), and 39-17-309 are penal statutes that are designed to protect the public.

110. Tennessee Code Annotated §§ 39-14-408, 39-14-405(a), 39-13-101(a), and 39-17-309 clearly define the conduct that they prohibit.

111. Ms. Halliburton belongs to the class of persons that Tennessee Code Annotated §§ 39-14-408, 39-14-405(a), 39-13-101(a), and 39-17-309 were designed to protect.

112. Ms. Halliburton's injuries are of the type that Tennessee Code Annotated §§ 39-14-408, 39-14-405(a), 39-13-101(a), and 39-17-309 were designed to prevent.

113. Officer Reynolds admitted under oath that "going in somebody's house and terrorizing them is not a mistake. That's a crime[.]" *See* **Exhibit #1**, p. 67, lines 13–15.

114. Officer Reynolds has admitted, under oath, that he "committed a crime that night[.]" *Id.* at lines 16–18.

115. Officer Reynolds has admitted, under oath, that he committed "[m]ultiple crimes" that night, *id.* at line 19; specifically, aggravated criminal trespass and multiple assaults against Ms. Halliburton and her children, to which he pleaded guilty. *See id.* at lines 19–21.

116. Officer Reynolds's violations of Tennessee Code Annotated §§ 39-14-408, 39-14-405(a), 39-13-101(a), and 39-17-309 were negligent *per se*, and Officer Reynolds is

-21-

liable to Ms. Halliburton for all damages suffered as a consequence of his *per se* negligent acts.

### COUNT 7: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

117. During the course of his interactions with Ms. Halliburton and her children, Officer Reynolds acted unreasonably and failed to use ordinary or reasonable care under the circumstances.

118. As a consequence of Officer Reynolds's breach of his duty of care, Ms. Halliburton witnessed her children threatened with deadly force and the risk of serious and imminent physical harm.

119. But for Officer Reynolds's breach of his duty of care, Ms. Halliburton would not have suffered a serious and severe emotional injury.

120. Witnessing Officer Reynolds terrorize her and her children, reasonably fearing that her children would be murdered in front of her, and fearing that she would be subject to deadly force herself caused Ms. Halliburton to suffer serious and severe emotional injury that is supported by scientific proof.

121. As a consequence of Officer Reynolds's breach of his duty of care, Officer Reynolds is liable to Ms. Halliburton for all serious and severe emotional injuries suffered as a consequence of his negligent infliction of emotional distress upon her.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests:

1. That process issue and be served upon the Defendant, and that the Defendant be required to appear and answer this Complaint within the time required by law;

-22-

2. All compensatory, consequential, and incidental damages to which the Plaintiff is entitled in an amount not less than $1,250,000.00;

3. Punitive damages in an amount not less than $3,750,000.00;

4. That the Plaintiff be awarded her discretionary costs and attorney's fees pursuant to 42 U.S.C. § 1988(b);

5. That pre-judgment and post-judgment interest be awarded to the Plaintiff;

6. That all costs be taxed against the Defendant;

7. That a jury of 12 be empaneled to try this cause; and

8. All such further relief as this Court deems just and proper.

Respectfully submitted,

By: /s/ Daniel A. Horwitz
   Daniel A. Horwitz, BPR #032176
   1803 Broadway, Suite #531
   Nashville, TN 37203
   daniel.a.horwitz@gmail.com
   (615) 739-2888

*Counsel for Plaintiff Conese Halliburton*

-23-